**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| AUTO CLUB GROUP INSURANCE | ) | |
| COMPANY, Subrogee of Richard Gerard, | ) | CIVIL ACTION NO.: 1:16-12227-TLL-PTM |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OMEGA FLEX, INC. | ) | |
| A Foreign Corporation | ) | August 17, 2017 |
| *Defendant.* | ) | |

## DEFENDANT OMEGA FLEX, INC.'S MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFF'S EXPERT MICHAEL WILLIAMS

Pursuant to Federal Rule of Civil Procedure 26 and Federal Rule of Evidence 702, as well as the requirements espoused in <u>Daubert v. Merrel Dow Pharms. Inc.</u>, 509 U.S. 579 (1993) and its progeny, Defendant, Omega Flex, Inc., ("Omega Flex"), by and through undersigned counsel, hereby moves this Court to exclude Plaintiff's expert Michael Williams ("Mr. Williams"), from testifying or offering any opinion contained with his reports as his opinions are without foundation and wholly speculative, or in the alternative, excluding him from testifying  or offering certain opinions included in his February 20, 2017 letter report as he is neither qualified nor are his opinions reliable or relevant.  As further explained in the attached Memorandum of Law, Omega Flex will show as follows:

1.      Mr. Williams' report in its entirety provides only conclusory postulation, and does not provide any data or facts relating to how he formed his conclusions, or any indication regarding how the particular materials influenced each opinion.  As such, Mr. Williams' report cannot be viewed as being in compliance with Federal Rule 26, and therefore the report (and any related testimony) must be stricken in its entirety.

2.    Mr. Williams is not qualified to render the opinion or related testimony that the fire in this instance was the result of a nearby lightning strike, as opposed to a direct lightning strike, nor can he reliably render such an opinion (or testimony), as Mr. Williams' opinion stems from his assumption that there was a nearby indirect lightning strike, and ignores and/or overlooks evidence that lightning did in fact strike the home directly.  Moreover, Mr. Williams is not an expert in lightning or electricity and was relying on another expert's opinion.[1]

3.    Mr. Williams is not qualified to render the opinion that warnings should be placed on the sheath of the CSST, nor will his opinion aid or assist the trier of fact, as the basis for his opinion stems from what he characterizes as "logic."  This cannot be viewed as an analytically sound bases or methodology; rather, his opinion cannot be viewed as anything more then mere speculation.  Further, he is not an expert in warnings, nor does he have any experience with human factors analysis and has never written a warning for any product.

4.    Mr. Williams cannot render the opinion that improvements could have been made to the product at issue as his opinion and related testimony are wholly generic as his opinion simply speculates that improvements *could* be made to the product, which *could* result in a better product; however, he does not provide any opinion as to what specific improvements could be made and his opinion not based on any sufficient data or facts, or experience.

In support of this Motion, Omega Flex offers its accompanying Memorandum of Law in Support of its Daubert based Motion to Exclude Certain Opinions (and testimony) of Mr. Williams and attached exhibits.

WHEREFORE, Omega Flex Inc., hereby moves this Court to exclude Plaintiff's proposed expert Michael Williams ("Mr. Williams"), from testifying or offering any opinion contained with his reports as his opinions are without foundation and wholly speculative, or in

---

[1] There is currently another motion pending before this Court regarding that expert's reliability as well.

the alternative, excluding him from testifying or offering certain opinions included in his

February 20, 2017 letter report as he is neither qualified nor are his opinions reliable or relevant.

Respectfully submitted on behalf of,

Dated August 17, 2017

**THE DEFENDANT,**
**OMEGA FLEX, INC.,**

By:   _/s/  Ashley Felton Eckerly_____
Ashley Felton Eckerly, Esq.
Gordon & Rees LLP
One North Franklin, Suite 800
Chicago, IL 60606
Tel: (312) 565-1400
Fax: (312) 566-6511
Email: aeckerly@gordonrees.com

## <u>CERTIFICATE OF SERVICE</u>

I, Ashley Felton Eckerly, hereby certify that, on this 17th day of August, 2017, the foregoing Motion was electronically filed with the Clerk of the Court using the *CM/ECF* system and paper copies will be sent by via certified mail, return receipt requested to the following non-registered *CM/ECF* participants on this date:

Jon B. Shefferly, Esq.
Jon Shefferly & Associates, P.C.
15050 East Jefferson Avenue, Suite 102
Grosse Pointe Park, MI 48230
sheffassociatespc@sbcglobal.net
*Counsel for Plaintiff*

By:   __/s/  Ashley Felton Eckerly_____
Ashley Felton Eckerly, Esq.

/34101659v.1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

———————————————————

AUTO CLUB GROUP INSURANCE          )
COMPANY, Subrogee of Richard Gerard,  )          CIVIL ACTION NO.: 1:16-12227-TLL-PTM
                                   )
           *Plaintiff,*            )
                                   )
v.                                 )
                                   )
OMEGA FLEX, INC.                   )
A Foreign Corporation              )          August 17, 2017
           *Defendant.*            )

———————————————————

### DEFENDANT OMEGA FLEX, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFF'S EXPERT MICHAEL WILLIAMS

Respectfully submitted on behalf of,

Dated August 17, 2017                    **THE DEFENDANT,**
                                         **OMEGA FLEX, INC.,**

                                    By:   */s/  Ashley Felton Eckerly*
                                          Ashley Felton Eckerly, Esq.
                                          Gordon & Rees LLP
                                          One North Franklin, Suite 800
                                          Chicago, IL 60606
                                          Tel: (312) 565-1400
                                          Fax: (312) 566-6511
                                          Email: aeckerly@gordonrees.com

## **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND INFORMATION .....................................................................2

     a.    Case Overview .........................................................................................2

     b.    Background of CSST .................................................................................4

     c.    Mr. Williams' Expert Reports....................................................................5

     d.    Mr. Williams' Deposition Testimony .......................................................7

III.    LEGAL STANDARDS .....................................................................................13

     a.    Federal Rule of Civil Procedure 26 ........................................................13

     b.    Federal Rule of Civil Procedure 37(c) ....................................................14

     c.    Federal Rule of Evidence 702 and Daubert ...........................................14

IV.    LEGAL ARGUMENT.......................................................................................18

     a.    Williams should be precluded from offering all opinions contained within his reports as his opinions are merely conclusory assertions violating Federal Rule 26. ...................................................................................18

     b.    Alternatively, if the Court does not exclude Williams' report in its entirety, Williams is not qualified to render the opinion that the Gerard fire was the result of a nearby lightning strike, as opposed to a direct lightning strike, nor can he reliably render that opinion.......................21

     c.    Williams is not qualified to render the opinion that warnings should be placed on the sheath of the CSST, nor will his opinion aid or assist the trier of fact.................................................................................................25

     d.    Williams cannot render the opinion that Omega Flex could have made improvements to the CSST as it will not aid or assist the trier of fact. .................27

V.    CONCLUSION..................................................................................................29

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Barrett v. Atl. Richfield Co.</u>,
    95 F.3d 375 (5th Cir.1996)............................................................................................ 16

<u>Berry v. City of Detroit</u>,
    25 F.3d 1342 (6th Cir. 1994)........................................................................................ 17

<u>Brainard v. Am. Skandia Life Assur. Corp.</u>,
    432 F.3d 655 (6th Cir.2005).............................................................................. 13, 14, 18

<u>Cason-Merenda v. Detroit Med. Ctr.</u>,
    2010 U.S. Dist. LEXIS 145416 (E.D. Mich. Oct. 18, 2010) .................................... 27

<u>Coffey v. Dowley Mfg., Inc.</u>,
    187 F.Supp.2d 958 (M.D.Tenn.2002), aff'd, <u>Coffey v. Dowley Mfg. Inc.</u>, 89
    Fed.Appx. 927 (6th Cir.2003) ..................................................................................... 25

<u>Daubert v. Merrell Dow Pharms., Inc.</u>,
    509 U.S. 579 (1993) ................................................. 1, 15, 16, 17, 21, 22, 24, 27, 29

<u>DePaepe v. GMC</u>,
    141 F.3d 715 (7th Cir. 1998)........................................................................................ 17

<u>Dickenson v. Cardiac and Thoracic Surgery of Eastern Tenn.</u>,
    388 F.3d 976 (6th Cir. 2004)........................................................................................ 14

<u>Eiben v. Gorilla Ladder Co.</u>,
    2013 U.S. Dist. LEXIS 59961 (E.D. Mich. Apr. 22, 2013) .................................... 14

<u>Gopalratnam v. Hewlett-Packard Co.</u>,
    2017 U.S. Dist. LEXIS 40386 (E.D. Wis. Mar. 21, 2017)....... 16, 17, 22, 23, 24, 25, 26, 27, 29

<u>Hilt v. F.F.C., Inc.</u>,
    170 F.R.D. 182 (D. Kan. 1997)................................................................................... 13

<u>In re Scrap Metal Antitrust Litig.</u>,
    527 F.3d 527 (6th Cir. 2008)........................................................................................ 15

<u>Marathon Petroleum Co. LP v. Midwest Marine, Inc.</u>,
    906 F. Sup. 2d 673 (E.D. Mich. 2012)..................................................................... 17

<u>McGowan v. Cooper Indus., Inc.</u>,
    863 F.2d 1266 (6th Cir.1987)................................................................................ 16, 22

<u>Mid-State Fertilizer Co. v. Exch. Nat'l Bank</u>,
    877 F.2d 1333 (7th Cir. 1989)..................................................................................... 14

<u>Nelson v. Tenn. Gas Pipeline Co.</u>,
    243 F.3d 244 (6th Cir. 2001)........................................................................................ 17

Pride v. BIC Corp.,
218 F.3d 566 (6th Cir. 2000) ................................................................... 16, 17, 25, 27

R.C. Olmstead, Inc. v. CU Interface, LLC,
606 F.3d 262 (6th Cir. 2010) ................................................................................ 13, 18

R.C. Olmstead, Inc. v. CU Interface, LLC,
657 F. Sup. 2d 905 (N.D. Ohio 2008), affirmed by 606 F.3d 262 (6th Cir.
2010) ............................................................................................... 13, 18, 19, 20

Redman v. John D. Brush & Co.,
111 F.3d 1174 (4th Cir.1997) ........................................................................................ 16

Roberts ex rel. Johnson v. Galen of Va., Inc.,
325 F.3d 776 (6th Cir.) ................................................................................................. 14

Salgado v. GMC,
150 F.3d 735 (7th Cir. 1998) ................................................................................. 13, 20

Smelser v. Norfolk Southern Ry. Co.,
105 F.3d 299 (6th Cir.1997) ........................................................................................ 25

Sommer v. Davis,
317 F.3d 686 (6th Cir. 2003) ....................................................................................... 14

SPX Corp. v. Bartec, LLC,
574 Supp. 2d 748 (E.D. Mich. 2008) ........................................................................ 14

Tamraz v. Lincoln Elec. Co.,
620 F.3d 665 (6th Cir. 2010) ................................................................................. 15, 26

United States v. Bonds,
12 F.3d 540 (6th Cir. 1993) ......................................................................................... 16

United States v. Langan,
263 F.3d 613 (6th Cir. 2001) ................................................................................. 16, 22

Vanderpool v. Edmondson,
2005 U.S. Dist. LEXIS 8611 (E.D. Tenn. March 23, 2005) ................................ 17, 18, 26

**Rules**

Fed. R. Civ. P. 26 ............................................................................... 1, 13, 18, 19, 21, 29

Fed. R. Civ. P. 37 ................................................................................... 1, 14, 21, 29

Fed. R. Evid. 402 ............................................................................................................ 19

Fed. R. Evid. 702 ....................................................................... 1, 14, 16, 19, 21, 27, 29

**Regulations**

29 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL
    PRACTICE AND PROCEDURE: EVIDENCE § 6264 pp. 214-15 and n.29
    (1997) ................................................................................................................ 18, 26

4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)............................................. 16

National Fuel Gas Code, ANSI Z223.1–2012 (NFPA 54–2012) §§ 5.6.3.4, 7.2.7,
    7.3.2, 7.13.2, passim (2012 ed.) ................................................................... 5

National Fuel Gas Code, ANSI Z223.1–2015 (NFPA 54–2015) §§ 5.6.3.4, 7.2.6,
    7.3.2, 7.13.2, passim (2015 ed.) ................................................................... 5

## I.    __INTRODUCTION__

Pursuant to Federal Rules of Civil Procedure 26 and 37(c)(1), and Federal Rule of Evidence 702, the Defendant Omega Flex, Inc. ("Omega Flex"), hereby submits this Memorandum of Law in Support of its Motion to Exclude Certain Opinions of Plaintiff's Expert Michael Williams, P.E. ("Mr. Williams").  Mr. Williams prepared two (2) letter reports outlining the opinions that he will offer at trial.  Omega Flex herein seeks to bar any use of Mr. Williams' expert reports and or from testifying regarding all opinions contained within his reports as in direct contravention of Federal Rule 26, the report is wholly lacking in reasoning or bases for his opinions, and instead provides mere conclusory postulations without support or rationale.[1]

Alternatively, Omega Flex, seeks to preclude Mr. Williams from offering certain opinions that do not meet the requirements for expert opinion as espoused in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) and its progeny.  Specifically, Mr. Williams should be excluded from testifying regarding the following opinions included in his February 20, 2017 letter report (Exhibit A):

1. That the hole found in the CSST was caused by a "nearby lightning strike."

2. That warnings should be placed on the sheath of the CSST; and

3. That Omega Flex could have made improvements to its CSST.

As detailed herein, Mr. Williams is not qualified to render the opinion that a *nearby* lightning strike occurred, nor is his opinion reliable.  In addition, Mr. Williams is not qualified to render the opinion that warnings should be placed on the sheath of the CSST, and, furthermore,

---

[1] Specifically this report includes Williams' opinions that 1) the hole in the corrugated stainless steel ("CSST") was caused by arcing initiated by a nearby lightning event; 2) CSST is unsafe because it is highly susceptible to damage from electrical arcing; 3) CSST is inherently dangerous; 4) Steel 40 black iron pipe is a practical alternative; 5) Omega Flex should have placed warnings on the sheath of the CSST; and 6) that Omega Flex could have made improvements to its CSST, particularly the sheath of the CSST.  These opinions are contained in two (2) letter reports, dated February 20, 2017 (attached hereto as **Exhibit A**) and August 18, 2016 (attached hereto as **Exhibit B**).

1

this opinion is of no use to the trier of fact as his opinion is not based on a recognized methodology, but rather is based on "logic." Lastly, Mr. Williams' opinion that Omega Flex could have made improvements to the CSST is unsupported and of no use to the trier of fact, as he cannot define what improvements should be made beyond generic opinion testimony.

## II.   **BACKGROUND INFORMATION**

### a.   **Case Overview**

This is a subrogation matter initiated by Auto Club Group Insurance Company (hereinafter "Auto Club") *a/s/o* Richard Gerard (hereinafter "Mr. Gerard" or the "Insured") in order to recover from losses involving a May 29, 2013 house fire at Mr. Gerard's home located in Bay City, Michigan. Amended Compl. at ¶¶ 2-3.   Auto Club alleges that Omega Flex manufactured TracPipe Corrugated Stainless Steel Tubing ("CSST" or "TracPipe") which allegedly failed as a result of a lightning strike.   Auto Club further alleges that this failure resulted in natural gas escaping the CSST, subsequently igniting, and causing the subject fire at Mr. Gerard's home.   Auto Club's Amended Complaint contains two (2) counts, sounding in negligence and breach of the implied warranty of merchantability.

More specifically, Auto Club alleges that the "investigation of the origin and cause of the fire of May 29, 2013 revealed that the fire originated in a space directly below a prefabricated metal fireplace in the residence living room.   Immediately prior to the discovery of the fire, there had been a lightning event with at least 5 strokes recorded within an area of less than ½ mile radius from the residence of Richard Gerard."   Amended Compl. at ¶ 8.   Auto Club further alleges that "the investigation further revealed that there were at least 2 holes in CSST which was also located in the space directly below the prefabricated fireplace."

In order to support their purported theories of liability, Auto Club will need to prove that there was a *nearby* lightning strike, that sufficient energy from that strike made its way into Mr.

2

Gerard's home to result in electrical arcing and perforation of *bonded* CSST, that natural gas leaving the CSST ignited, and that the natural gas escaping the CSST was the first fuel ignited. In short, Auto Club will need to establish causation. In addition, with respect to its warranty claim, Auto Club will need to prove that the utility of Omega Flex's CSST is outweighed by its alleged risk; namely, CSST's alleged susceptibility to perforation resulting from a lightning strike.

Omega Flex will dispute each of these assertions.  In particular, Omega Flex avers that Mr. Gerard's home unquestionably was *directly* struck by lightning and that the cause of the subject fire was lightning, not a purported failure of the CSST.  This position is supported by ample evidence; including electrical damage to home's chimney and flue pipe and perforations found in other gas lines *not* manufactured by Omega Flex (which resulted in a visible flame shooting out of Mr. Gerard's fireplace).  Omega Flex will further proffer that there is no evidence that the holes found in the CSST were caused by an electrical arcing event; in fact, there is substantial evidence that the hole which largely forms the basis for Auto Club's claim is too big to have been caused by the lightning strike (i.e. that the hole was caused by the fire itself).  Furthermore, Omega Flex's experts will opine that natural gas leaving the CSST could *not* have been ignited by an electrical arcing event and therefore gas leaving the CSST was *not* the first fuel ignited.  Moreover, Omega Flex will offer substantial evidence in support of its position that the utility of its TracPipe CSST greatly outweighs any perceived risk of the product. In summary, Omega Flex's position is that the CSST did not cause the fire at Mr. Gerard's home and that its CSST is not defective pursuant to Michigan law.

Not surprisingly, much of the debate regarding these factual and legal disputes involves competing opinions of the parties' respective experts.  One of the Plaintiff's experts regarding

cause, defect and warnings, is Michael Williams, whose opinions are the subject of the instant Motion.

### b.     Background of CSST

Before discussing Mr. Williams' reports and testimony in detail, a discussion of the underlying product, CSST will hopefully provided this Court with additional context regarding the issues in dispute.[2]  TracPipe is a brand of CSST and is commonly used in residences to distribute fuel gas (either natural gas or propane) throughout the structure. CSST is often used either in conjunction with or in place of traditional black iron pipe. Black iron pipe, unlike CSST, must be installed in straight rigid lengths connected by multiple threaded fittings to change directions as the pipe is routed through walls, ceilings, and crawlspaces.

Since CSST is flexible, its installation only requires fittings at junctions and at connections to appliances.  Thus the installation of CSST requires many fewer fittings than the installation of black iron pipe for a similar household configuration. This makes a CSST system less expensive to install than a black iron pipe system, and less prone to leaks. Gas leaks can occur at a fitting due to the fitting not being properly tightened, or to the fitting loosening over time, and are a common safety hazard in homes with gas service.  CSST reduces the risk of gas leaks (due to the reduced number of fittings) and thus is a safer alternative than black iron pipe. CSST also provides additional safety over black iron pipe in resisting damage from acts of nature, such as earthquakes, tornadoes, landslides, floods and hurricanes.  Any event that causes a shift in the house foundation and/or structure may cause relative movement of two ends of a gas line.  If that gas line is CSST, the inherent flexibility of CSST can accommodate.

---

[2] The information contained in this introductory paragraph is largely taken from the report of Timothy L. Morse, Ph.D. at Appendix B. This report, including the appendices, is attached as Exhibit D. Relevant citations are included in Appendix B.

CSST products, including TracPipe, are listed by Underwriters' Laboratories (UL) and have been independently tested and found to be suitable for the distribution of fuel gas within a structure in accordance with ANSI LC-1/CSA 6.26 Fuel Gas Piping Systems Using Corrugated Stainless Steel Tubing (CSST). In addition, CSST is required to be installed only by a qualified installer who has passed the manufacturer's certification/training program.

The alleged attendant risk of CSST is that it is allegedly more susceptible to perforation from an electrical arcing event than black iron pipe resulting from a lightning strike/event. This is allegedly the result of its thinner walls than black iron pipe which are necessary for the product's flexibility; an attribute with many benefits as discussed above. However, to combat the purported risk due to lightning, CSST manufacturers, including Omega Flex, require that its product be bonded to the building's grounding electrode (which it was at the Gerard home). Michigan regulations specifically permit the use of CSST, even with the alleged attendant risk of fire from lightning strikes which is at issue in this case. See Mich. Admin. Code R. 408.30500. Moreover, the National Fuel Gas Code, a model code cosponsored by the American Gas Association and the National Fire Protection Association, also permits the installation of CSST with bonding and grounding to mitigate lightning risk. See National Fuel Gas Code, ANSI Z223.1–2015 (NFPA 54–2015) §§ 5.6.3.4, 7.2.6, 7.3.2, 7.13.2, passim (2015 ed.); National Fuel Gas Code, ANSI Z223.1–2012 (NFPA 54–2012) §§ 5.6.3.4, 7.2.7, 7.3.2, 7.13.2, passim (2012 ed.). Although the CSST was installed in the Gerard residence in 2006, the installation was performed in accordance with Michigan's present building code and Omega Flex's Design and Installation Guide.

### c.    Mr. Williams' Expert Reports

Michael Williams, P.E., has been disclosed by Auto Club as an expert regarding defect and warning. His opinions are contained in two (2) reports, including an initial letter report

dated August 18, 2016 (attached hereto as **Exhibit B**); and a February 20, 2017 letter report (Exhibit A). Each of these reports detail Mr. Williams' opinions in conclusory fashion, but provide little guidance regarding Mr. Williams' expertise or the specifics concerning his methodology and how he reached his conclusions.

Specifically, Mr. Williams' August 18, 2016 report lists individuals likely to have discoverable information relating to this action, documents and information in his possession, and a brief summation of certain details surrounding the fire, namely the date and location of the fire. See Exhibit B. Additionally, Mr. Williams' report identifies the date of his inspection of the fire scene. See id. After stating the date of his investigation, Mr. Williams concludes as follows:

> . . . The CSST piping was investigated and found to have a substantial hole caused by electrical arcing initiated by a nearby lightning strike. Our investigation was conducted in accordance with NFPA-921 and our findings are that the piping is unsafe because it is highly susceptible to damage from electrical arcing.

See id.

Mr. William's final report is dated February 20, 2017. See Exhibit A. Notably, the report offers no details or specifics regarding the "investigation." In this final report Mr. Williams provides a "complete statement of all [of his] opinions," and then goes on to summarize his opinions. In addition to his aforementioned conclusion from his August 2016 report, Mr. Williams also concludes as follows:

> Since this product exhibits characteristics that make it susceptible to electrical arc damage and such damage is inherently dangerous to the occupants of any structure containing this product, I have concluded that it is not reasonably safe as manufactured ...

> There was and is a technically feasible and practical alternative available to provide safe and reliable distribution of fuel gas throughout a structure such as schedule 40 steel pipe, which would greatly increase the usefulness, durability, and ease with which the gas distribution could be altered ... in the future. This

alternative has been used for decades, it is economically competitive, proven safe and is well known to the manufacturers of CSST.

There are methods of improving the safety, reliability, and durability of the CSST product that appear to be technically and economically feasible which have no been employed by the manufacturer of this product. Improvements that could be made to the safety, reliability, usefulness and durability of this product include, but are not limited to the following: after 2 decades of production and sale of this product to contractors and homeowners, I note that no warnings appear on the sheath of this product. There should be a visible warning that the installation of this product must include electrical bonding and grounding of the gas distribution system. I note that there have never been any warnings to consumers that this product may be unsafe if exposed to electrical activity. Improvements could be made to the stainless steel itself and the sheathing, and there are additional protections that could be added to the exterior of the sheathing.[3]

Exhibit A. Furthermore, Mr. Williams states that "[a]ny of the file material that has thus far been provided [and] any of the evidence that has been retained as part of the investigation into the Gerard fire" will be used to summarize or support his conclusions. Id. There is no reference or index attached to the report which designates what materials or evidence was used to support a particular opinion or conclusion of his. See id.

### d.   Mr. Williams' Deposition Testimony

Mr. Williams was deposed on March 22, 2017, and a condensed version of that transcript is attached hereto as **Exhibit C**. During his deposition, Mr. Williams testified regarding his background and offered further guidance regarding his opinions. Mr. Williams' background is in environmental engineering. Exhibit C at p. 112. He is not an electrical engineer, nor is he a certified fire investigator ("CFI") or a certified fire and explosion investigator ("CFEI"). Id. at p. 23, 27. Mr. Williams is not licensed to install gas piping, is not certified to install CSST, has never overseen the installation of a CSST gas line, has never been a licensed plumber, and is not a metallurgist. Id. at p. 27-28. Additionally, Mr. Williams is not an expert in warnings, does not

---

[3] During his deposition, Williams acknowledged that "homeowners" should be removed from this opinion, as it is "not [his] contention that Omega Flex sells … CSST products to home owners." Exhibit C at p. 123-25.

have any experience with any human factors analysis, and has never written a warning for any product. Id. at p. 128.

During his deposition it became clear that Mr. Williams' opinions rest on the assumption that the Gerard home was not struck by lightning; rather, his opinion is that the lightning struck somewhere near the building (approximately 800-1,000 feet away), and the electrical charge somehow got into the building. Id. at pp.72-88. Of note, Mr. Williams acknowledged that he was relying on another's opinion with respect to cause in this action. Id. at pp. 28-29. He also acknowledged that he is not a lightning expert and has not had any training specific to lightning. Id. at p. 95. Moreover, Mr. Williams testified that there was no evidence anywhere of burning on the ground, burned grass, or any physical evidence of a lightning strike within the vicinity of the residence which could support his claim of an indirect lightning strike. Id. at p. 84. Further, when asked to explain what he had done to confirm that this instance involved an indirect lightning strike, Mr. Williams testified that he "reviewed the STRIKEnet lightning report."[4] Id. at pp. 78. Moreover, when asked if he had done anything to verify, model, or otherwise determine that this "indirect lightning" could have resulted in enough energy getting into the CSST line to cause the perforations in the CSST and the flexible gas connector, Mr. Williams responded, "[t]he evidence I have is the holes themselves." Id. at pp. 79-80. When asked to explain how the electricity from the assumed indirect lightning strike made its way into the building, the colloquy went as follows:

> Q.    Okay. And so it's your opinion that this lightning struck 800, a thousand feet away from the home, got by the other surrounding homes, made it into Mr. Gerard's house and that's when the electrical arcing occurred?

---

[4] Notably, when asked what the margin of error was for the STRIKEnet report, Williams stated "they provide that… and the margin of error that they talk about has to do with location, not whether or not there was a strike." Exhibit C at p. 82.

A.     I don't know that it got by anything. It *probably* went 50 other places besides the Gerard home. The home next door had electrical damage to it.

Q.     So then if that occurred and the electricity went 50 places, how is it that you had enough energy to cause the arcing event to create this hole in the CSST on a bonded CSST line?

**A.     Because of the fact that enough electricity was attracted to whatever, that that's where it found its way to.**

Id. at pp. 84-85 (emphasis added).

Despite Williams' lack of knowledge regarding lightning, whether the lightning struck the home or did not strike the home is of particular importance to Mr. Williams' opinion. Admittedly Williams' testified that a lightning strike to a home can also cause a fire:

Q.     Okay.  Have you been involved with investigations where fires were simply caused by lightning itself where lightning ignited the wood structure of a home or wood sawn in the house?

A.     I think so.  I've had some investigations where the exact cause of the incident was never exactly proven because the structure burned to the ground, but it's believed that they were caused by lightning strikes.

Q.     What I'm getting at is that a fire can result simply because of a lightning strike; is that correct?

A.     It is.

Q.     For example, if a tree is hit that tree could be ignited by being struck by lightning?

A.     Yes.

Q.     And would you agree with me that a direct lightning strike to a home can and often does cause fires?

**A.     Yes, I would agree.   In fact, I would say that it always causes significant damage to a house or to any structure.**

Q.     So if the Gerard home was directly struck by lightning, it would be your opinion that a fire would have resulted?

A.      Not necessarily.  It would be my opinion that you would see significant damage to the structure.

Exhibit C at p. 46 (emphasis added).

It also became clear that Mr. Williams did not perform any analysis on the holes in the CSST, but rather "polled" people in his laboratory regarding the cause.  Id. at p. 62 (stating "we had not done the formal metallurgical analysis that could be done … I was under the impression at our laboratory that everyone agreed [the larger hole was caused by] electrical arcing).[5]

In addition to the above testimony, Mr. Williams was examined regarding his opinions that warnings should be placed on the sheath of the CSST, and that improvements can be made to the stainless steel and sheathing of the CSST.  However, when pressed on the basis for these opinions, Williams conceded a lack of methodology, knowledge, and lack of testing.  With respect to additional warnings, Williams testified as follows:

Q.      . . . And it's not your contention that TracPipe is sold directly to consumers –

…

A.      . . . it's not my content[ion] that Omega Flex sells TracPipe or any other CSST products to home owners.[6]

…

Q.      And you'd agree with me that the DNI guide gives warnings regarding lightning and provides instructions regarding bonding?

A.      Yes. And those instructions appear to me to have been followed.[7]

…

Q.      Describe for me the methodology that you used to come up with this opinion that warning should be included on the sheath of the product.

---

[5] It should be noted that electrical arcing can be the result of electrical arcing from the lightning discharge, but can also result from damage to the household electrical system.

[6] Williams also admitted that Mr. Gerard testified that prior to the fire he had no idea of what was in his home. Exhibit C at p. 125.

[7] Williams also acknowledged that in this instance the product was installed by a certified installer.  Exhibit C at p. 125.

> A.   **The methodology that I used, I would describe it as logic.  I did not do any safety studies, I did not do any statistical analysis.**  I see the problems that can develop with the use of CSST, I see how thin walled it is, I see how easily it's punctured, I see that it is vulnerable to arcing damage from lightning. And I think that people should be made aware of the fact that there are these hazards to it and that there is another alternative which may cost a few percent more for the total installation then the installation of CSST.
>
> …
>
> Q.   **You'd agree with me that you have no experience with any human factors analysis?**
>
> A.   **Not in this job no.**
>
> Q.   **Would you agree with me that you're not an expert in warnings?**
>
> A.   **Yes, I would.**
>
> Q.   **And would you agree with me that you've never written a warning for a product?**
>
> A.   **That's correct.**

Id. at pp. 124-26, 128 (emphasis added).

Likewise, with respect to Williams' opinion that improvements can be made to the CSST itself, Williams again acknowledged a lack of knowledge and testing:

> Q.   What improvements could be made to the stainless steel itself?
>
> A.   Different grades of stainless steel and different alloys of stainless steel and different thickness of stainless steel.
>
> Q.   And what different grading should be used, in your opinion?
>
> A.   **I don't know.  I haven't done lab metallurgical studies of it to find something that still had an amount of flexibility to it and was more puncture proof.**
>
> Q.   And what different alloys should be used?
>
> A.   Again, I'm not a metallurgist and that's one of the reasons why I have asked Omega [in interrogatories] to provide me with what research they have done in those areas.

…

Q.      You mentioned that the thickness can be improved.  How much thicker, in your opinion, should the stainless steel be?

A.      **I don't know.  I say that's one of the possibilities that could be done.  I don't know what the research has shown at this point.**

Q.      You also mention additional protection can be made to the exterior?

A.      Yes.

Q.      What protections are you talking about?

A.      The sheathing *could* be thicker, the sheathing *could* be multilayers that has shielding in it. Beyond that, there could be an exterior covering called a Faraday cage or a Faraday trap . . .

…

Q.      And with respect to the thickness, the multi-exteriors, the exterior covering, can you give me anything else specific to your opinions as far as how much thicker the exterior should be?

A.      **No. Again, I don't know, but research data has already been compiled by Omega or any of the other manufacturers . . .**

Q.      **But this is a specific analysis you haven't yet performed?**

A.      **That's correct.  My opinion is that it could be performed and the results could be a much stronger, safer, longer lasting product that would not be absolutely outrageously costly.**

Id. at pp. 129-131 (emphasis added).

Furthermore, Williams testified that despite being well past the disclosure deadlines, he was continuing to conduct additional testing and/or research.[8]  Id. at pp. 7-8, 13-17.  Specifically, Williams stated that he "[might] offer more detail upon which [he] base[s] [his] conclusions, but nothing about [his] conclusions has changed."  Id. at pp. 7-8.  When asked why Williams was

---

[8] With respect to additional research, Williams testified that this consisted of reading "various published papers on the general subject of CSS and … various other studies that have been done on CSST." Exhibit C at pp. 9-10. Notably, Williams conceded that he was "sure all of [these studies] were available" at the time of the disclosure deadline. Id. at p. 10.

conducting additional testing beyond the disclosure deadline despite having this case for years,[9] and Williams understanding that his cumulative opinions were due in February, he responded that "[he] was in the midst of doing it, when [the disclosure] deadline came up, and [he] felt it important to meet [the] deadline." Id. at pp. 13-14.

### III.   LEGAL STANDARDS

#### a.   Federal Rule of Civil Procedure 26

Pursuant to the Federal Rules of Civil Procedure, expert reports must be "detailed and complete." See Fed. R. Civ. P. 26 Advisory Committee's note (stating a complete report must include the substance of the testimony which an expert is expected to give together with the reasons therefor); see also Salgado v. GMC, 150 F.3d 735, 741 n.6 (7th Cir. 1998). Specifically, an expert report must contain "the data or other information considered… in forming" the conclusions or "any exhibits that will be used to summarize or support" the conclusion. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii)-(iii). Further, "'an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation.'" R.C. Olmstead, Inc. v. CU Interface, LLC, 606 F.3d 262, 271 (6th Cir. 2010) (quoting Brainard v. Am. Skandia Life Assur. Corp., 432 F.3d 655, 664 (6th Cir.2005)).   Specifically, "'[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.'" Id. (quoting Salgado, 150 F.3d at 742 n. 6).  See also R.C. Olmstead, Inc. v. CU Interface, LLC, 657 F. Supp. 2d 905 (N.D. Ohio 2008), affirmed by 606 F.3d 262 (6th Cir. 2010)  (quoting Hilt v. F.F.C., Inc., 170 F.R.D. 182, 185 (D. Kan. 1997) (stating "[a]n expert 'report must provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness has reached them'").   "[A]n expert who supplies nothing but a bottom line supplies nothing of

---

[9] Williams acknowledged that he was retained about three or four days following the fire.  See Exhibit C at p. 14.

value to the judicial process." Brainard, 432 F.3d at 664 (quoting Mid-State Fertilizer Co. v. Exch. Nat'l Bank, 877 F.2d 1333, 1339 (7th Cir. 1989)).

  **b.  Federal Rule of Civil Procedure 37(c)**

Fed. R. Civ. P. 37(c)(1) provides where a party fails to "provide information . . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." See Fed. R. Civ. P. 37(c)(1).  The Sixth Circuit reads Rule 37(c)(1) to require absolute compliance with Rule 26; that is it mandates that a trial court punish a party by excluding the non-disclosed evidence, unless the violation was harmless or is substantially justified.  Eiben v. Gorilla Ladder Co., 2013 U.S. Dist. LEXIS 59961 at *17-18 (E.D. Mich. Apr. 22, 2013) quoting Dickenson v. Cardiac and Thoracic Surgery of Eastern Tenn., 388 F.3d 976, 983 (6th Cir. 2004). See also SPX Corp. v. Bartec, LLC, 574 Supp. 2d 748, 756-57 (E.D. Mich. 2008).  A violation is "harmless" when it is based upon "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party."  Sommer v. Davis, 317 F.3d 686, 692 (6th Cir. 2003); Roberts ex rel. Johnson v. Galen of Va., Inc., 325 F.3d 776, 783 (6th Cir.)  The burden is on the potentially sanctioned party to prove harmlessness and justification. Dickenson, 388 F.3d at 983.

  **c.  Federal Rule of Evidence 702 and Daubert**

Federal Rule of Evidence 702 provides the standard governing a court's determination of whether to admit scientific or other expert testimony.  It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

14

The rule incorporates the principles established in <u>Daubert v. Merrell Dow Pharms., Inc.</u>, in which the Supreme Court charged trial courts with a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993). Under <u>Daubert</u> a Court has two roles: determining whether the evidence is reliable and analyzing whether the evidence is relevant. <u>Daubert</u>, 509 U.S. at 590-593. Courts must focus "solely on principles and methodology, not on the conclusions that they generate." <u>Id.</u> at 595; <u>see also</u> <u>Tamraz v. Lincoln Elec. Co.</u>, 620 F.3d 665, 675 (6th Cir. 2010) ("The important thing is not that experts reach the right conclusion, but that <u>they reach it via a sound methodology</u>"). <u>Daubert</u> also sets forth non-exclusive factors a district court may consider in evaluating whether an expert opinion is based on sufficiently reliable methodology, including (1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high rate of error and whether there are standards controlling the technique's operation; and (4) whether the technique is "generally accepted" within the "relevant scientific community." <u>Id.</u> at 593-94.

The focus of a court's evaluation should be on whether an expert's testimony "is scientifically valid," by examining the non-exclusive set of factors outlined above, thus "ensuring that an expert's testimony both <u>rests on a reliable foundation</u> and is relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 580, 600 (emphasis added). Furthermore, the Sixth Circuit, in <u>In re Scrap Metal</u>, has reiterated requirements of Rule 702. <u>See</u> <u>In re Scrap Metal Antitrust Litig.</u>, 527 F.3d 527, 529 (6th Cir. 2008). First, the proposed expert must have the requisite qualifications, whether it be through knowledge, skill, experience, training, or education. <u>Id.</u> Second, the proposed testimony must be relevant, which entails the testimony "will help the trier

of fact to understand the evidence or to determine a fact in issue." Id. quoting Fed. R. Evid. 702. Third, the proposed expert testimony must be reliable. Id.

Reliability can be assessed in a number of ways. Id. Testimony can be reliable if it is "based on sufficient facts or data," or "the product of reliable principles and methods" which the expert in turn has applied to the facts of the case. Id. citing Fed. R. Evid. 702; Gopalratnam v. Hewlett-Packard Co., 2017 U.S. Dist. LEXIS 40386 at *11-12 (E.D. Wis. Mar. 21, 2017) (noting the "expert's testimony must be based on sufficient facts or data and is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case"). See also 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000) (a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise.")  In other words, a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue.  Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir.1997); Barrett v. Atl. Richfield Co., 95 F.3d 375, 382b (5th Cir.1996).  A court determining the reliability of proposed expert testimony may consider "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community."  United States v. Langan, 263 F.3d 613, 621 (6th Cir. 2001) citing Daubert, 509 U.S. at 593-94.  See Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) citing United States v. Bonds, 12 F.3d 540, 556 (6th Cir. 1993); Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury. McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir.1987) (emphasis added). "If an expert uses hypothetical explanations for causes of an event, those hypotheticals must have analytically sound bases rendering them more then mere

speculation" and/or conjecture. Gopalratnam, 2017 U.S. Dist. LEXIS at *13 quoting DePaepe v. GMC, 141 F.3d 715, 720 (7th Cir. 1998).

Furthermore, an opinion will not be considered relevant under 702 and/or Daubert if it will not help or assist the trier of fact to better understand the evidence or decide a material fact in issue. Vanderpool v. Edmondson, 2005 U.S. Dist. LEXIS 8611, at *17 (E.D. Tenn. March 23, 2005). "In short, under Daubert and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." Pride, 218 F.3d 566, 578 (6th Cir. 2000) citing Daubert, 509 U.S. at 592 n.10. See also Nelson v. Tenn. Gas Pipeline Co., 243 F.3d 244, 251 (6th Cir. 2001). Notably, an expert's opinion must be based on methods and procedures of science, rather then on subjective belief or unsupported speculation. Pride, 218 F.3d 566, 578 (6th Cir. 2000) citing Daubert, 509 U.S. at 592 ("This requirement, [that the testimony assist the trier of fact] has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result(s) being offered and the disputed factual issues in the case in which the expert will testify.") See Marathon Petroleum Co. LP v. Midwest Marine, Inc., 906 F. Sup. 2d 673, 684-85 (E.D. Mich. 2012) citing Berry v. City of Detroit, 25 F.3d 1342, 1350 (6th Cir. 1994) (An expert opinion is not relevant or helpful when it merely deals with a proposition that is not beyond the ken of common knowledge, e.g. "[i]f everyone knows this, then we do not need an expert because the testimony will not 'assist the trier of fact to understand the evidence or to determine a fact in issue.") "Expert testimony does not assist where the [trier of fact] has no need for an expert opinion because it can easily be derived from common sense, common experience, the [fact finder's] own perceptions, or simple

logic." Vanderpool v. Edmondson, 2005 U.S. Dist. LEXIS at *17 citing 29 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6264 pp. 214-15 and n.29 (1997).

## IV.   LEGAL ARGUMENT

### a.   Williams should be precluded from offering all opinions contained within his reports as his opinions are merely conclusory assertions violating Federal Rule 26.

Pursuant to the Federal Rules of Civil Procedure, an expert report must include "the facts or data considered… in forming" the conclusions or "any exhibits that will be used to summarize or support" the conclusion. *See* Fed. R. Civ. P. 26(a)(2)(B)(iii). In general, expert opinions, must "set forth facts," as well as his or her "line of reasoning" specifically including "how" and "why" the expert reached a particular result, rather then offering mere conclusory opinions. R.C. Olmstead, Inc., 606 F.3d at 271; Brainard, 432 F.3d at 664 (6th Cir.2005).

For example in, R.C. Olmstead, Inc., the District Court barred plaintiff from using its expert report, as the report failed to comply with the requirements of Fed. R. Civ. P. 26(a)(2)(B). R.C. Olmstead, Inc. v. CU Interface, LLC, 657 F. Supp. 2d 905 (N.D. Ohio 2008), affirmed by 606 F.3d 262 (6th Cir. 2010). Specifically, the district court found that plaintiff's expert's report was inadequate as it failed to provide a complete statement of the reasons for the opinion, and did not contain the information or data considered by the expert in forming his opinion.[10] Id. at 908-13. The R.C. Olmstead involved a provider of credit union software's claims against the developer of a competing credit union software and credit union for copyright and trademark infringement. See generally R.C. Olmstead, Inc. v. CU Interface, LLC, 657 F. Supp. 2d 905 (N.D. Ohio 2008), affirmed by 606 F.3d 262 (6th Cir. 2010).

---

[10] Please note the court also found the report violated Rule 26 as the report failed to state any compensation paid for his report, or his qualifications and education. R.C. Olmstead, Inc. v. CU Interface, LLC, 657 F. Supp. 2d at 903-913.

During the pendency of the matter, the plaintiff provided an expert report that was "about one and one-half pages long, reference[d] no documents or exhibits … and contain[ed] a single nine sentence paragraph stating the expert's opinion and *some* of the basis for it" along with an attachment of approximately 197 pages, consisting of the data the expert alleged he used to support his conclusions. R.C. Olmstead, Inc., 657 F. Supp. 2d at 907. Subsequently, defendants filed a motion to bar the expert report as it did not comply with Federal Rule 26, Federal Rules of Evidence 402 and 702. Id. at 907-08.

Ultimately, the district court granted this motion finding that the almost two (2) page report did "not even attempt a complete statement of all bases and reasons" for his opinion, and in fact, despite the requirement (Rule 26) that an expert report must provide the substantive rationale and reasons for proferred opinions, "wholly lack[ed] reasoning from [the expert's] alleged bases to his ultimate conclusion…" Id. at 909-11. For example, the court explained that the expert listed "similarities" between the two softwares, but "never explained why the alleged similarities indicate[d] actual copying of plaintiff's software, rather than that the softwares simply perform similar functions (and thus would be expected to function similarly)." Id. at 910-11. The court further noted that the conclusory report lacked any line of reasoning and/or logical foundation as to how the limited number of similarities between softwares tailored for the same purpose amounted to the opinion that plaintiff's software was indeed copied. Id. at 911. Additionally, the district court found that the report also did not comply with Rule 26 as the report failed to provide any specifics regarding the versions of the softwares he reviewed, failed to reference the documents or data he considered in justifying his opinion (beyond merely attaching a voluminous exhibit), failed to provide any indication as to

19

how those documents or data influenced his conclusions, and failed to distinguish which opinion(s) are based on the review of the documents attached to his report.  Id. at 911-12.

In another case, Salgado, the Seventh Circuit found an expert report deficient under Rule 26, where the report provided a voluminous set of materials with a generic index, but lacked any keying or reference between the opinion the expert had expressed and the reviewed materials, thereby violating the requirement that the opinion be "detailed and complete." Salgado, 150 F.3d at 738.

In this instance, as noted by this Court in its Order granting Omega Flex's Motion to Strike (Docket No. 27), Williams' report in its entirety "provides only conclusory postulations," and therefore, the report in its entirety should be stricken, as Mr. Williams failed to provide any data or facts relating to how he formed his conclusions, or any indication as to how the particular materials influenced each of his opinions.  See Court's Order Granting Omega Flex Motion to Strike (Docket No. 27), at p. 8.  Much like the expert report in R.C. Olmstead, Williams' three (3) page report is silent regarding his line of reasoning and/or bases for how his opinions were reached, specifics regarding the materials or data he considered and/or justified his opinions, how that material or data influenced his opinions, and failed to identify which of his six opinions were based or connected on specific materials or data.

For example, in this instance, Williams' report, makes a reference to an "investigation," which demonstrated that "the piping is unsafe because it is highly susceptible to damage from electrical arcing;" however, Williams offers no details or information regarding that investigation.  See Court's Order Granting Omega Flex Motion to Strike (Docket No. 27), at p. 8 (citing Exhibit A of this Motion at p. 2).  Furthermore, Williams' report offers no explanation of how he reached his conclusions, nor did he provide exhibits or data offering any support or

explanation for his opinions.  For example, Mr. Williams states that "schedule 40 pipe" is a "technically feasible and practical alternative," but offers no explanation or summation of how "schedule 40 pipe" differs from CSST.  See id. (citing Exhibit A of this Motion at p. 3). Additionally, Mr. Williams opines that "[the CSST] exhibits characteristics that make it … not safe as manufactured," but fails to explain how he arrived at this conclusion.  Id.  Again, an expert's opinion must demonstrate and explain the bases and line of reasoning for each opinion or conclusion, rather then simply providing subjective belief or unsupported speculation, and therefore, Mr. Williams' report must be excluded as it violates the requirements of Fed. R. Civ. P. 26.

Fed. R. Civ. P. 37(c)(1) provides where a party fails to "provide information . . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  See Fed. R. Civ. P. 37(c)(1).  Certainly, Plaintiff has failed to provide information as required under 26(a)(2)(B).  Moreover, there is no evidence that these failures are substantially justified or harmless. Therefore, given that Mr. Williams' report provides mere conclusory statements, rather than the substantive rationale and reasons for all of his proferred opinions, it cannot comply with Rule 26, and therefore, Plaintiff should be barred from relying on this opinion in its entirety.

  **b.**   **Alternatively, if the Court does not exclude Williams' report in its entirety, Williams is not qualified to render the opinion that the Gerard fire was the result of a nearby lightning strike, as opposed to a direct lightning strike, nor can he reliably render that opinion.**

As discussed *supra* pursuant to Rule 702 and Daubert (and its progeny), the focus of a court's evaluation should be on whether an expert's testimony "is scientifically valid," by examining the non-exclusive set of factors outlined above, thus "ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand."  <u>Daubert</u>, 509 U.S. at 580, 600 (emphasis added).  <u>See also</u> <u>United States v. Langan</u>, 263 F.3d at 621 (noting to determine reliability a court may consider "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community.")  However, expert testimony that constitutes <u>mere personal belief</u> invades the province of the jury. <u>McGowan v. Cooper Indus., Inc.</u>, 863 F.2d 1266, 1273 (6th Cir.1987) (emphasis added). "If an expert uses hypothetical explanations for causes of an event, those hypotheticals must have analytically sound bases rendering them more then mere speculation" and/or conjecture.  <u>Gopalratnam</u>, 2017 U.S. Dist. LEXIS at *13.

For example, in <u>Gopalratnum</u> a district court barred plaintiffs from using multiple expert witnesses as their opinions were based on speculation and unfounded inferences, and therefore unreliable.  <u>See</u> <u>generally</u>, <u>Gopalratnam</u>, 2017 U.S. Dist. LEXIS 40386 (E.D. Wis. Mar. 21, 2017).  In that case the plaintiffs alleged that the "internal failure of [a] lithium ion battery" in plaintiffs' son's laptop caused a fire in the plaintiffs' home, which originated in the "area [on plaintiffs' son's] bed where his laptop sat."  <u>Id.</u> at *3-6, 38-39.  In particular, the court found that the opinion of the "battery expert," who opined that a manufacturing defect in the battery caused the fire, was unreliable as the conclusion consisted of unsubstantiated conclusory statements, not supported by scientific methodology or testing.  <u>Id.</u> at *33-34.  The court based this determination on the fact that the battery expert made the assumption, without conducting *any* testing, that the subject battery cell expelled its contents as a result of internally generated heat, rather then external heat.  <u>Id.</u> at *33.  Indeed, the court noted that even the expert during his

deposition acknowledged that a cell may expel its contents during a fire, but that does not necessarily mean that the cell started the fire.  Id. at *34.

As discussed *supra*, Mr. Williams' opinion regarding cause stems from his *belief* that there was a nearby, indirect lightning strike.  In his report, Mr. Williams concludes that "[t]he CSST piping was investigated and found to have a substantial hole caused by electrical arcing initiated by a nearby lightning strike."  Exhibit A at p. 1.  During his deposition Mr. Williams similarly testified that it is his opinion is that the lightning struck somewhere in the vicinity of the building, and the electrical charge got into the residence.  See generally Exhibit C at pp. 72-88.  Williams, however, clearly is not qualified to render this opinion.  For example, Williams testified that there was absolutely no physical evidence of any lightning strike in the vicinity of the residence, and that a direct lightning strike can also cause a fire and "always causes significant damage to a house or to any structure."  Id. at p. 46.  In addition, when asked to describe how the electricity from the assumed indirect lightning strike made its way into the building, Mr. Williams responded as follows:

> Q.   Okay. And so it's your opinion that this lightning struck 800, a thousand feet away from the home, got by the other surrounding homes, made it into Mr. Gerard's house and that's when the electrical arcing occurred?
>
> A.   I don't know that it got by anything. It *probably* went 50 other places besides the Gerard home. The home next door had electrical damage to it.
>
> Q.   So then if that occurred and the electricity went 50 places, how is it that you had enough energy to cause the arcing event to create this hole in the CSST on a bonded CSST line?
>
> A.   **Because of the fact that enough electricity was attracted to whatever, that that's where it found its way to.**

Id. at pp. 84-85 (emphasis added).

23

Much like the battery expert in <u>Gopalratnam</u> who assumed that the battery cell ejected its contents as a result of internally generated heat, Williams failed to move past his own assumption, and ignored other evidence.  Indeed, despite Williams' assumption of indirect lightning, there is ample evidence that lightning did in fact strike the home.  For example, the StrikeNet report referenced by Mr. Williams evidences that five (5) strokes of lighting occurred at 1:44 a.m. on the night in question and that any of these strikes could have hit Mr. Gerard's home.  <u>See</u> Report of Timothy L. Morse, Ph.D., March 20, 2017 at p. 12 (**Exhibit D**) (showing that the strikes were within the "confidence ellipses" of StrikeNet).   In addition, Mr. Gerard testified that after he "heard" lightning, he "immediately" saw a flame coming from under his fireplace. <u>See</u> Deposition of Richard Gerard, December 29, 2016 (attached hereto as **Exhibit E**) at pp. 11-12.  <u>See</u> <u>also</u> Exhibit C at p. 73-74 (Williams reiterated that Mr. Gerard saw a flame under his fireplace almost simultaneously with the flash of lightning and clap of thunder).  Moreover, there were multiple locations on the chimney cap where metal had melted and re-solidified.  <u>See</u> Exhibit D at pp. 17-20.  Electrical damage was also present on the flue piping leading from the chimney to, coincidentally, the fireplace where Mr. Gerard witnessed a flame. <u>Id.</u>  This evidence was overlooked by Mr. Williams, likely because, by his own admission, he is not an expert in lightning or electricity and was relying on another expert's opinion.  <u>See</u> Exhibit C at pp. 28-29, 95.

Finally, as Mr. Williams is clearly unqualified to render an opinion regarding lightning and, specifically, whether it directly struck Mr. Gerard's home, his testimony in this regard is not reliable and will not aid the trier-of-fact.  Simply, Mr. Williams' proposed testimony does not "**rest[] on a reliable foundation…**" and therefore must be excluded.  <u>See</u> <u>Daubert</u>, 509 U.S. at 580, 600 (emphasis added).  In fact, Mr. Williams acknowledged that he based his assumption

regarding the lightning on the StrikeNet report, and "the holes" themselves.[11]  Id. at pp. 74, 78-90.  Moreover, Mr. Williams could not explain as to how there was enough energy from an indirect lightning strike (approximately 800-1,000 feet away from the residence that went to "probably 50 other places besides the Gerard home") could cause the arcing event to create the hole in the CSST on a bonded CSST line, stating, "[b]ecause of the fact that enough electricity was attracted to whatever, that that's where it found its way to."  Id. at pp. 84-85.  Again, personal beliefs or conclusion are insufficient to establish reliability, and without sufficient data and facts, an expert witness cannot be found reliable.  See Gopalratnam, 2017 U.S. Dist. LEXIS at *46 (noting that the cause and origin expert's assumption that flashover did not occur without more, particularly test that he could have performed to confirm or disprove that assumption, could not be considered reliable).

### c.   Williams is not qualified to render the opinion that warnings should be placed on the sheath of the CSST, nor will his opinion aid or assist the trier of fact.

Likewise, Mr. Williams cannot opine that warnings should be placed on the sheath of the CSST as he is not qualified to make such an opinion, nor will his opinion aid or assist the trier of fact.  As discussed supra, Mr. Williams' opinion regarding warnings stems from what he characterized as "logic." Exhibit C at p. 126.  In his final report, Mr. Williams concludes that "there should be a visible warning [on the sheath of the CSST] that the installation of th[e] product must include electrical bonding and grounding of the gas distribution system." Exhibit A at p. 2.  During his deposition Mr. Williams similarly testified that it is his opinion that a

---

[11]  Again, Williams did not perform any analysis on the holes in the CSST, but rather "polled" people in his laboratory regarding the cause.  Exhibit C at pp. 62, 77-78.  Importantly, the Sixth Circuit has held that "a failure to test a hypothesis may disqualify a witness from testifying as an expert."  Coffey v. Dowley Mfg., Inc., 187 F.Supp.2d 958, 977 (M.D.Tenn.2002), aff'd, Coffey v. Dowley Mfg. Inc., 89 Fed.Appx. 927 (6th Cir.2003); Smelser v. Norfolk Southern Ry. Co., 105 F.3d 299, 304 (6th Cir.1997) (applying Daubert to exclude the testimony of a biomechanical engineer who failed to conduct pertinent testing).  See also Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) (affirming exclusion of expert testimony regarding the cause and origin of a fire purportedly caused by a lighter, due to a failure to conduct adequate testing).

warning should be placed on the sheath of the CSST.  Exhibit C at p. 123.  However, Williams is not qualified to make this opinion.

Admittedly, Mr. Williams testified that he was not an expert in warnings, nor did he have any experience with any human factors analysis and has never written a warning for any product. Id. at p. 128.  Moreover, when asked about his methodology for this opinion, Mr. Williams responded as follows:

> **The methodology that I used, I would describe it as logic**.  **I did not do any safety studies, I did not do any statistical analysis.**  I see the problems that can develop with the use of CSST, I see how thin walled it is, I see how easily it's punctured, I see that it is vulnerable to arcing damage from lightning. And I think that people should be made aware of the fact that there are these hazards to it and that there is another alternative which may cost a few percent more for the total installation then the installation of CSST.

Id. at p. 126 (emphasis added).  Furthermore, Williams acknowledged that Omega Flex does not sell CSSTs directly to home owners, and that the D&I guides provide warnings regarding lightning and instructions to bond the product.  Id. at pp. 124-25.  Moreover, Williams testified that in this instance, the CSST was sold to a certified installer who followed the warnings in the D&I guide regarding lightning and bonding.  Id. at p. 125-26.

Williams' opinion regarding warnings cannot be considered relevant or an opinion that would assist the trier of fact, as a trier of fact has no need for an expert opinion which can be derived from "common sense … or simple **logic**."  Vanderpool v. Edmondson, 2005 U.S. Dist. LEXIS at *17 citing 29 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6264 pp. 214-15 and n.29 (1997) (emphasis added).  Furthermore, it is not important at this stage that an expert reach the right conclusion, but rather that the expert reached it via a "sound methodology."  Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 675 (6th Cir. 2010).  Much like in Gopalratnam, where the battery expert failed to

present any scientific methodology, testing or evidentiary support for his opinion that a manufacturing defect caused the fire, here Williams does not present any analytically sound bases or any methodology for that matter that would render his opinion anything more then mere speculation. See Gopalratnam, 2017 U.S. Dist. LEXIS at *33.

In summary, Mr. Williams' opinion that the warnings should be placed on the sheath of the product at issue in unreliable, because he is not qualified to render such an opinion, nor would his "opinion" assist the trier of fact in any way.

> **d.    Williams cannot render the opinion that Omega Flex could have made improvements to the CSST as it will not aid or assist the trier of fact.**

In addition to requiring an expert's opinion be reliable, Rule 702 and Daubert (and its progeny), require that the opinion assist the trier of fact.  Cason-Merenda v. Detroit Med. Ctr., 2010 U.S. Dist. LEXIS 145416, at 9 (E.D. Mich. Oct. 18, 2010) citing Pride, 218 F.3d 566.  Mr. Williams in his final report concludes that, "[t]here are methods of improving the safety, reliability, and durability of the CSST product that appear to be technically and economically feasible which have not been employed in the manufacturer of this product … Improvements that could be made to the stainless steel itself and the sheathing, and there are additional protections that could be made to the exterior of the sheathing."  Exhibit A at p. 2.  Likewise, during his deposition Mr. Williams testified that it is his opinion that improvements could be made to the stainless steel and the sheathing of the product at issue.  Exhibit C at pp. 128-31.  However, Mr. Williams could not define those improvements, and as such Mr. Williams' generic and unsupported opinion cannot be considered relevant because it will not assist the trier of fact.

For example, when asked what improvements could be made to the stainless steel, the colloquy went as follows:

> Q.    What improvements could be made to the stainless steel itself?

A.      Different grades of stainless steel and different alloys of stainless steel and different thickness of stainless steel.

Q.      And what different grading should be used, in your opinion?

A.      **I don't know.  I haven't done lab metallurgical studies of it to find something that still had an amount of flexibility to it and was more puncture proof.**

Q.      And what different alloys should be used?

A.      Again, I'm not a metallurgist and that's one of the reasons why I have asked

        Omega to provide me with what research they have done in those areas.

…

Q.      You mentioned that the thickness can be improved.  How much thicker, in your opinion, should the stainless steel be?

A.      **I don't know.  I say that's one of the possibilities that could be done.  I don't know what the research has shown at this point.**

Q.      You also mention additional protection can be made to the exterior?

A.      Yes.

Q.      What protections are you talking about?

A.      The sheathing *could* be thicker, the sheathing *could* be multilayers that has shielding in it. Beyond that, there could be an exterior covering called a Faraday cage or a Faraday trap . . .

…

Q.      And with respect to the thickness, the multi-exteriors, the exterior covering, **can you give me anything else specific to your opinions as far as how much thicker the exterior should be?**

A.      **No. Again, I don't know**, but research data has already been compiled by Omega or any of the other manufacturers . . .

Q.      **But this is a specific analysis you haven't yet performed?**

A.      **That's correct.  My opinion is that it *could* be performed and the results *could* be a much stronger, safer, longer lasting product that would not be absolutely outrageously costly**.

Exhibit C at p. 128-31 (emphasis added).  It is evident that this opinion is not based on any sufficient data or facts, experience, or knowledge of Mr. Williams, and therefore, this unsupported testimony cannot be viewed as reliable or relevant as an expert's wholly generic and abstract opinion that improvements *could* be made to a product, which *could* result in a better product, without more will not assist the trier of fact.  See Gopalratnam, 2017 U.S. Dist. LEXIS at *33 (finding that the battery expert's opinion without testing or any supporting methodology or bases was not admissible pursuant to Rule 702).

**V.   CONCLUSION**

Wherefore, pursuant to Federal Rules of Civil Procedure 26 and 37(c)(1), and Federal Rule of Evidence 702 and the requirements espoused in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) and its progeny, Mr. Williams should be excluded from testifying regarding all opinions contained within his reports as his opinions are without foundation and wholly speculative, or alternatively, Mr. Williams' should be excluded from testifying regarding the following opinions included in his February 20, 2017 letter report as he is neither qualified nor are his opinions reliable or relevant:

1.   That the hole found in the CSST was caused by a "nearby lightning strike."

2.   That warnings should be placed on the sheath of the CSST; and

3.   That Omega Flex could have made improvements to its CSST.

29

Respectfully submitted,

Dated August 17, 2017                    **THE DEFENDANT,**
                                         **OMEGA FLEX, INC.,**

                              By:  __/s/  Ashley Felton Eckerly_____
                                   Ashley Felton Eckerly, Esq.
                                   Gordon & Rees LLP
                                   One North Franklin, Suite 800
                                   Chicago, IL 60606
                                   Tel: (312) 565-1400
                                   Fax: (312) 566-6511
                                   Email: aeckerly@gordonrees.com

## CERTIFICATE OF SERVICE

I, Ashley Felton Eckerly, hereby certify that, on this 17th day of August, 2017, the foregoing Motion was electronically filed with the Clerk of the Court using the *CM/ECF* system and paper copies will be sent by via certified mail, return receipt requested to the following non-registered *CM/ECF* participants on this date:

Jon B. Shefferly, Esq.
Jon Shefferly & Associates, P.C.
15050 East Jefferson Avenue, Suite 102
Grosse Pointe Park, MI 48230
sheffassociatespc@sbcglobal.net
*Counsel for Plaintiff*

By: __*/s/  Ashley Felton Eckerly*_____
Ashley Felton Eckerly, Esq.